# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **YVONNE COTTA, individually and as a representative of the ESTATE OF JOHN COTTA, and MADISON COTTA, a minor represented by guardian ad litem YVONNE COTTA,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**COUNTY OF KINGS and SGT. SHARI HENDERSON, Does 1 through 30,**<br><br>**Defendants.** | **1:13-cv-359-LJO-SMS**<br><br>**MEMORANDUM DECISION AND ORDER RE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Doc. 60)** |

## I. INTRODUCTION

This case concerns the death of John Cotta ("Decedent"), who was allegedly killed by his cellmate on April 23, 2012, while incarcerated at Kings County Jail ("the jail"). *See* Doc. 47, Second Amended Complaint ("SAC"), at ¶ 4. Yvonne Cotta ("Mrs. Cotta"), individually and as the representative of the Estate of John Cotta, the Estate of John Cotta ("the Estate"), Madison Cotta, and Kaylianna Cotta (collectively, "Plaintiffs") bring this suit against the County of Kings ("the County") Sergeant Shari Henderson ("Sgt. Henderson") (collectively, "Defendants"), and Does 1-50 on the ground Defendants violated Decedent's constitutional rights while he was incarcerated and those violations ultimately caused his death. *See id.* at 9-15.

Currently pending before the Court is Defendants' motion for summary judgment. Doc. 60. The Court did not set a hearing for the motion and the parties did not request one. Doc. 70. The Court finds it appropriate to rule on the motion without oral argument. *See* Local Rule 230(g); *id.* For the following reasons, the Court GRANTS IN PART and DENIES IN PART Defendants' motion for summary judgment.

## II. FACTUAL BACKGROUND

On June 29, 2010, Decedent and Heath Parnell ("Parnell") were arrested after a car chase with the police. Doc. 68, Defendants' Response to Plaintiffs' Statement of Disputed Facts ("UMF"), 19. Parnell was the driver. SAC at ¶ 9. "Many shots were fired during the chase, with police officers barely escaping serious injury or death." *Id.* Decedent was charged multiple felony charges, including auto theft and attempted murder of a peace officer. UMF 19. Decedent was then taken to the jail.

When booking inmates, the jail employs an objective classification system to classify inmates to determine their "securing level" and where they should be housed. UMF 16. The parties do not dispute that the jail's housing and classification policy ("the policy") "was in compliance with California Code of Regulations Title 15 ["Title 15[2]"] and accepted standards in the State of California." UMF 14.[3] Jail authorities use information the inmate provides, as well as information, including but not limited to the inmate's current charges, prior convictions, escape history, disciplinary history, and gang affiliation. *See* UMF 18.

When booked at the jail, Decedent stated that he would not have "problems on the streets with anyone," that he had not "provided information about criminal activity/testified against other person[s]," and that he was not an informant. UMF 21. Decedent did not "anticipate any problems with inmates while in custody." UMF 22.

Henderson was assigned as the Classification Sergeant in 2009, *id.*, and has been properly trained with respect to all of her duties in that position. UMF 12. In that capacity, she has the sole and unreviewable authority to make housing decisions at the jail. UMF 27. Accordingly, she made all housing-related decisions concerning Decedent. *Id.* None was approved by other jail staff, nor was any

---

[1] The parties have significant disagreements as to which facts are established and which facts remain disputed. Defendants have lodged numerous objections to certain evidence Plaintiffs submitted. *See, e.g.*, Doc. 68-3. The Court has reviewed the parties' disputes and objections (and Plaintiffs' responses to them), and finds that the following facts are not credibly disputed. Further, the Court OVERRULES Defendants' objections unless otherwise indicated.

[2] Generally speaking, Title 15 regulates California jail policies. *See generally* 15 Cal. Code Regs., Div. 3, Adult Institutions, Programs and Parole.

[3] Because these are legal conclusions, the Court does not accept them as established facts.

required to be approved. *Id.*

Henderson testified that, although co-defendants generally are not housed together, it is not mandatory under applicable law or the jail's classification and housing policy, but rather is determined on a case-by-case basis. *See* Henderson Depo. at 22:20-24. One exception, however, is for "snitches" (*i.e.*, law enforcement informants), who are indefinitely placed in protective custody. *Id.* at 53:2-3. Henderson has granted and denied requests for co-defendants to be housed together. *See id.* at 67. Henderson explained that a perceived adversity between co-defendants, such as one "telling on" the other or one taking a plea deal that the other opposes, can lead to their being housed separately. *See id.* at 28:1-4, 68:2-18.

Due to the high-profile nature of his case, Henderson initially decided to house Decedent alone. *See* Doc. 65-5 at 5. On July 6, 2010, Decedent was moved to the jail's general population housing, but he was not housed with Parnell. *Id.* On February 8, 2011, February 17, 2011, and May 8, 2011, Decedent submitted three written requests to be housed with Parnell as his cellmate. UMF 24. He also made multiple oral requests to Henderson to be housed with Parnell as his cellmate. UMF 25. Henderson eventually authorized Decedent's request, and he was housed with Parnell as his cellmate from May 17, 2011 until his death on April 23, 2012. UMF 27. In January 2012, Decedent and Parnell jointly requested to be moved to another location in the jail. UMF 32.

Henderson was unaware that Decedent "had given a statement to any law enforcement official that was against the interests of Parnell." UMF 28. Henderson had no knowledge that Decedent and Parnell ever had any altercations, that Parnell ever threatened Decedent, or that Parnell had attempted to intimidate Decedent. UMF 29. Henderson had no knowledge that Parnell pressured Decedent to request that they be housed together. UMF 30. Henderson was unaware that Parnell had ever been violent toward any inmate at the jail, including Decedent. UMF 31. Decedent spoke with Henderson on a number of occasions and never expressed to her that he believed that Parnell was a threat to his safety. UMF 35. Henderson never received any information from anyone that Parnell threatened Decedent's

safety. UMF 36.

At all relevant times, the jail had a written policy concerning cell check searches. UMF 37. The policy required "a cell check at the beginning of every shift and at least hourly thereafter." UMF 39. Jail deputies received ongoing training on conducting cell checks and searches that comply "with the minimum guidelines set forth by the State of California Standards and Training for Corrections ('STC')." UMF 42; *see also* UMF 78. Jail staff also receives training on monitoring the safety of inmates and classification and housing of inmates. UMF 78. At all relevant times, the jail's staff "met or exceeded the minimum standards for training set forth by STC." UMF 78; *see also* UMF 73-77.

In March 2012, a jury convicted Parnell and Decedent for crimes they committed during the course of the car chase. SAC at ¶ 15. Decedent did not testify at the trial, but his defense—that Parnell was the primary actor and he was an unwilling participant—was adverse to Parnell. *See* Doc. 65-4, Deposition of Christopher Caine ("Caine Depo."), at 20. Their sentencing was set for April 24, 2012. Doc. 65-4, Deposition of Carlos Navarette ("Navarette Depo."), at 11:8-11.

Around 11:21 P.M. on April 22, 2012, Deputy Justin Davis checked Decedent's and Parnell's cell. UMF 49. Around 12:37 A.M. on April 23, 2012, Deputy Rosalie Garcia-Gonzalez checked their cell. *Id.* Around 1:33 A.M. on April 23, 2012, Deputy Eric Hobbs checked their cell. *Id.* The deputies could see parts of both Decedent's and Parnell's bodies and did not note any signs of disturbance or anything otherwise out of the ordinary. UMF 50.[5] Henderson was not on duty between 4:00 P.M. on April 22, 2010, and 7:45 A.M. on April 22, 2010, and had no supervisorial responsibility over the deputies. UMF 55-56.

---

[4] Plaintiffs dispute all of these facts concerning Henderson's state of mind and what she did or did not know about the relationship between Parnell and Decedent. *See* UMF 28-31, 33-36. Plaintiff asserts that Henderson's "self-serving testimony as to her state of mind and what she knew when cannot overcome the compelling circumstantial facts showing she was deliberately indifferent." UMF 28. Plaintiffs list fifteen of these "circumstantial facts" that they argue demonstrate Henderson's deliberate indifference. *Id.* Although these circumstantial facts may be relevant to determining whether Henderson in fact was deliberately indifferent to Decedent, they do not create a genuine issue of material fact as to the factual basis of Henderson's testimony.

[5] Plaintiffs dispute these facts, asserting that the cell checks "were extremely cursory and substandard." *See* UMF 49-51. Even assuming that is true, it does not negate the undisputed fact that the checks occurred when they did, according to jail staff testimony.

The cells are monitored by video camera and are equipped with an intercom system that permits jail staff to hear inside a cell when its intercom is activated. UMF 57-58. On the night of April 22-23, 2010, Detentions Technician Felicia Dudley ("Dudley") had not seen or heard any disturbance until approximately 1:40 A.M. when she received an intercom call from Parnell, who reported that Decedent was not breathing and needed medical attention. UMF 60-61. Dudley immediately contacted Deputies Garcia-Gonzalez, Davis, and Hobbs, and requested that they respond to Decedent's and Parnell's cell. UMF 61.

When the Deputies arrived, it appeared that Decedent was asleep. UMF 67. They soon determined that Decedent had died, apparently by ligature strangulation with a bed sheet. UMF 70. Decedent's death is estimated to have occurred on April 23, 2012, between 12:40 A.M. and 1:40 A.M. UMF 71. "With ligature strangulation, [Decedent] could have died within minutes." UMF 72.

It is undisputed that Parnell killed Decedent. *See* Doc. 60-1 at 33 (Defendants stating that "[a]ssuming as we do that Parnell murdered [Decedent] . . . "). Plaintiffs assert that the reason Parnell killed decedent was because Decedent's trial defense was adverse to Parnell in that Decedent's attorney argued Decedent was an unwilling participant and Parnell was wholly at fault.

### III. PROCEDURAL HISTORY

Mrs. Cotta filed this case on March 12, 2013, individually, as a representative of the Estate, and on the behalf of Madison, Decedent's daughter. Doc. 1. Because Madison is a minor, this Court appointed Mrs. Cotta as Madison's guardian ad litem on July 5, 2013. Doc. 20. Mrs. Cotta filed a first amended complaint on August 4, 2013 (Doc. 26) and a second amended complaint ("the SAC")—currently the operative complaint—on May 28, 2014. The SAC names Kaylianna, Decedent's daughter and Madison's half-sister, as an additional Plaintiff. SAC at ¶ 5.

Plaintiffs assert four causes of action.[6] Plaintiffs' first claim is brought against Henderson under

---

[6] The SAC contains six causes of action; however, Plaintiffs withdrew their third and fifth claims for relief in their opposition. *See* Doc. 67 at 19, n.17 ("Because Sgt. Henderson was both the initial actor and policy maker under applicable law, it is unnecessary to prove that she also is subject to supervisory liability. Plaintiffs accordingly withdraw their Third Claim for Relief, and their corresponding negligent supervision claim under state law (Fifth Claim)."). Given Plaintiffs'

§ 1983 for exhibiting deliberate indifference to Decedent's serious safety needs in violation of Decedent's Eighth and Fourteenth Amendment rights. SAC at ¶¶ 25-28. Plaintiffs' second claim is a *Monell*[7] claim against the County. *Id.* at ¶¶ 29-32. Plaintiffs' third claim is brought against all Defendants under § 1983 on the ground Defendants caused their loss of familial relations with Decedent in violation of their Fourteenth Amendment rights. *Id.* at ¶¶ 38-41. Plaintiffs' fourth claim for wrongful death is brought against all Defendants under California Code of Civil Procedure § 377.60 et seq. *Id.* at ¶¶ 50-53. The thrust of all four claims is that Defendants' unconstitutional failure to provide adequate safety for Decedent violated his constitutional rights and ultimately caused his death, which resulted in Plaintiffs suffering damages.

Defendants have moved for summary judgment on all four claims. Doc. 60. Defendants assert that, as a threshold matter, Mrs. Cotta does not have standing to bring any of the claims in any capacity. *See* Doc. 60-1 at 2. Defendants maintain that they are entitled to summary judgment on Plaintiffs' first three causes of action, all of which assert a constitutional violation, because Decedent suffered no violation of his constitutional rights. *See id.* at 2-3. Defendants argue that Plaintiffs' fourth claim for wrongful death is improper as a matter of law. *Id.* at 3.

Plaintiffs filed an opposition to Defendants' motion on December 15, 2017[8], to which Defendants replied on December 22, 2014. Doc. 68. The matter is now ripe for adjudication.

---

apparent admission that these claims are not tenable, the Court DISMISSES WITH PREJUDICE Plaintiffs' third and fifth causes of action.

[7] *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978).

[8] Plaintiffs filed two oppositions (Docs. 64, 67), the second of which was filed one day late and is approximately ten pages shorter than the first. Plaintiffs also filed a number of documents one day late in support of their opposition. *See* Docs. 65-1 through 65-11, 66. It appears that Plaintiffs moved approximately ten pages from their originally filed opposition into their statement of disputed facts, which Defendants assert was an effort to circumvent this Court's rule limiting opposition briefs to 25 pages. *Compare* Doc. 64 at 7-16 *with* Doc. 65 at 11-21. Defendants request that the Court not consider Plaintiffs' opposition due to these procedural improprieties. *See* Doc. 68-2 at 3-4. Although Plaintiffs' filings did not comply with this Court's orders and Local Rules, the Court can discern no prejudice to Defendants if the Court were to consider them. Moreover, Plaintiffs' originally filed opposition is approximately five pages over this Court's page limit for oppositions. The Court nonetheless will consider only Plaintiffs' second opposition (Doc. 67)—not to reward an officer of this Court who violates the rules he is obligated to know and follow, but so as not to punish a party who hired a lawyer it thought would know and follow the rules.

6

**IV. STANDARD OF DECISION**

Summary judgment is appropriate when the pleadings, disclosure materials, discovery, and any affidavits provided establish that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that may affect the outcome of the case under the applicable law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable trier of fact could return a verdict in favor of the nonmoving party." *Id.*

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). The exact nature of this responsibility, however, varies depending on whether the issue on which summary judgment is sought is one in which the movant or the nonmoving party carries the ultimate burden of proof. *See Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007); *Cecala v. Newman*, 532 F. Supp. 2d 1118, 1132 (D. Ariz. 2007). If the movant will have the burden of proof at trial, it must demonstrate, with affirmative evidence, that "no reasonable trier of fact could find other than for the moving party." *Soremekun*, 509 F.3d at 984. In contrast, if the nonmoving party will have the burden of proof at trial, "the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case." *Id.* (citing *Celotex*, 477 U.S. at 323).

If the movant satisfies its initial burden, the nonmoving party must go beyond the allegations in its pleadings to "show a genuine issue of material fact by presenting *affirmative evidence* from which a jury could find in [its] favor." *FTC v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009) (emphasis in original). "[B]ald assertions or a mere scintilla of evidence" will not suffice in this regard. *Id.* at 929; *see also Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that

there is some metaphysical doubt as to the material facts") (citation omitted). "Where the record as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

In resolving a summary judgment motion, "the court does not make credibility determinations or weigh conflicting evidence." *Soremekun*, 509 F.3d at 984. That remains the province of the jury or fact finder. *See Anderson*, 477 U.S. at 255. Instead, "[t]he evidence of the [nonmoving party] is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Id.* Inferences, however, are not drawn out of the air; the nonmoving party must produce a factual predicate from which the inference may reasonably be drawn. *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898 (9th Cir. 1987).

# V. <u>ANALYSIS</u>

## A. <u>Whether Plaintiffs Have Standing.</u>

Mrs. Cotta asserts claims individually, as the representative of the Estate, and as guardian ad litem for Madison. Mrs. Cotta has the legal authority to bring a survival action on behalf of the Estate only if she is Decedent's personal representative or successor in interest. *See* Cal. Code Civ. Proc. § 377.30 ("§ 377.30"). Defendants maintain that Mrs. Cotta lacks standing to assert claims on Decedent's behalf. *See* Doc. 60-1 at 17. Defendants argue that generally only the personal representative of an estate has standing to bring survival claims, but where, as here, there is no personal representative of an estate, only a successor in interest may bring survival claims.[9] *Id.* Accordingly, Defendants argue that because Mrs. Cotta is not the personal representative of the Estate, she has no standing to bring survival claims on Decedent's behalf. *Id.*

---

[9] The survival claims at issue here are Plaintiffs' first, second, and fourth causes of action brought under § 1983. Their sixth cause of action for wrongful death is not deemed a "survival claim" and, as such, is analyzed under different standards. *See Adams*, 196 Cal. App. 4th at 191-92 ("A wrongful death cause of action is a statutory claim providing compensation for specified heirs of the decedent for the loss they suffered as a result of the decedent's death . . . . Thus, unlike a wrongful death action, a survival action is a cause of action that existed while the decedent is alive and survives the decedent."). Importantly here, the personal representative of a decedent's estate may bring a wrongful death claim on behalf of the decedent's heirs. *Id.* at 191 ("As a 'personal representative' of the deceased, plaintiff may maintain the action on behalf of the heirs—i.e. as 'a statutory trustee to recover damages for the benefit of the heirs.'" (citation omitted)).

**F.     Standard.**

Under § 1983, a decedent's survivors may bring a claim for the violation of their substantive

constitutional rights or those of the decedent. *See, e.g.*, *Conn v. City of Reno*, 591 F.3d 1081, 1096 (9th

Cir. 2010) (citing *Farmer*, 511 U.S. at 828) (emphasis in original), *vacated*, 131 S.Ct. 1812 (2011),

*reinstated as modified*, 658 F.3d 897 (9th Cir. 2011) (§ 1983 action brought by children of pre-trial

detainee who committed suicide). A § 1983 claim survives the decedent if it accrued before the

decedent's death and if applicable state law permits a survival action. *See Tatum*, 441 F.3d at 1093 n.2.

"The party seeking to bring a survival action bears the burden of demonstrating that a particular state's

law authorizes a survival action and that the plaintiff meets that state's requirements for bringing a

survival action." *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 369 (9th Cir. 1998)

(citation omitted).

Under California law, "a cause of action for . . . a person is not lost by reason of the person's

death, but survives." Cal.Code Civ. Proc., § 377.20(a). Section 377.30 addresses who may pursue a

survival action for a decedent:

> A cause of action that survives the death of the person entitled to commence an action or
> proceeding passes to the decedent's successor in interest, subject to [the California Probate
> Code]  . . . and an action may be commenced by the decedent's personal representative or, if
> none, by the decedent's successor in interest.

Thus, "where there is no personal representative for the estate, the decedent's 'successor in

interest' may prosecute the survival action." *Tatum v. City & Cnty. of San Francisco*, 441 F.3d 1090,

1093 n.2 (9th Cir. 2006) (citing Cal. Code Civ. Proc. §§ 377.20, 377.32 ("§ 377.32")). "The 'personal

representative' is the person or firm appointed by the probate court to administer the probate of a

decedent's estate." *Miller v. Campbell, Warburton, Fitzsimmons, Smith, Mendel & Pastore*, 162 Cal.

App. 4th 1331, 1340 (2008).

California Code of Civil Procedure § 377.11 defines a successor in interest as (1) "the

beneficiary of decedent's estate" or (2) any "other successor in interest who succeeds to a particular item

of the property that is the subject of a cause of action." In the context of an intestate decedent, the

"beneficiary of the decedent's estate" is "a person who succeeds to claims or property under Probate

9

Code sections 6401 and 6402. Cal. Code Civ. Proc. § 377.10(b).

### 2. Mrs. Cotta.

On December 15, 2014, the Superior Court for the County of Tulare appointed Mrs. Cotta as the personal representative of the Estate. *See* Doc. 65-9 at 1. As such, she is authorized to bring claims on behalf of the Estate. *See Tatum*, 441 F.3d at 1093 n.2; § 377.30.

### 3. Madison.

Under California Probate Code § 6402(a), if an individual dies intestate without a surviving spouse or domestic partner, the decedent's estate passes to "the issue of the decedent." Thus, because Decedent died intestate, the parties do not dispute that his children, Madison and Kaylianna, are his successors in interest. UMF 3; *see also* Cal. Prob. Code § 6402(a). Because Madison is a minor, her claims must be prosecuted by a guardian ad litem. *See* Fed. R. Civ. P. 17(c); Local Rule 202(a). Mrs. Cotta's request to be designated as Madison's guardian ad litem was granted on July 5, 2013. Doc. 20.

However, Defendant now challenges whether the procedural pre-requisites have been satisfied to permit Madison's claims as a successor in interest, brought through Ms. Cotta as Madison's guardian ad litem. A successor in interest who "seeks to commence an action or proceeding" on behalf of a decedent "shall execute and file an affidavit" that conforms with the enumerated requirements of § 377.32(a). *See Wishum v. California*, No. 14-cv-1491-JST, 2014 WL 3738067, at *2 (N.D. Cal. July 28, 2014) ("Section 377.32 requires any party seeking to commence an action as a decedent's successor in interest to file an affidavit or declaration stating the basis for that designation."). Among other things, § 377.32(c) provides that "[a] certified copy of the decedent's death certificate shall be attached to the affidavit." Because Decedent's death certificate was not attached to Mrs. Cotta's affidavit, Defendants argue that "Mrs. Cotta . . . lacks standing to prosecute this action since her declaration failed to comply with the mandatory requirements" of § 377.32. Doc. 60-1 at 18.

Plaintiffs argue, among other things, that the Court's prior rulings (and Defendants' failure to challenge those rulings) foreclose Plaintiffs' arguments. *See* Doc. 67 at 8-13. Specifically, Plaintiffs point to the Magistrate Judge's order granting Mrs. Cotta's application to be appointed as guardian ad

litem for Madison. Vt. at 8 (citing Doc. 20). In granting the application, the Magistrate Judge noted that "Mrs. Cotta has provided the supporting declaration under [§ 377.32], with the exception of a copy of the death certificate [of Decedent], which Mrs. Cotta declares has not been provided to her despite multiple requests. (No party in this action disputes that [Decedent] died April 23, 2012." Doc. 20 at 1. Accordingly, the law of the case indicates that Mrs. Cotta has been excused from filing a certified copy of Decedent's death certificate.

The law of the case doctrine generally precludes a court from "reconsidering an issue that already has been decided by the same court, or a higher court in the identical case." *United States v. Alexander*, 106 F.3d 874, 876 (9th Cir. 1997). The law of the case doctrine has three exceptions that may permit departure from the law of the case when: (1) the original decision is clearly erroneous and its enforcement would work a manifest injustice, (2) intervening controlling authority makes reconsideration appropriate, or (3) substantially different evidence was adduced at a subsequent trial. *Old Person v. Brown*, 312 F.3d 1036, 1039 (9th Cir. 2002).

Here, only the first exception to the law of the case could apply. The Court, however, does not find that the Magistrate Judge's decision to excuse Mrs. Cotta from filing a certified copy of Decedent's death certificate pursuant to § 377.32 was clearly erroneous. Accordingly, the law of the case forecloses Defendants' argument that Mrs. Cotta lacks standing to pursue the claims she has brought in this case as Madison's guardian ad litem. Regardless, Plaintiffs filed a certified copy of Decedent's death certificate along with their opposition to Defendants' motion for summary judgment. *See* Doc. 65-10. Thus, Plaintiffs have cured the prior deficiencies of Mrs. Cotta's affidavit.[10]

In sum, Mrs. Cotta has standing to bring claims on behalf of the Estate as its personal representative. As Madison's guardian ad litem, she also has standing to bring Madison's claims as Decedent's successor in interest.

---

[10] Because of this finding, the Court need not address Defendants' argument that Mrs. Cotta is time-barred from filing a corrected or amended § 377.32 affidavit. *See* Doc. 60-1 at 18-19.

11

**4.      Kaylianna.**

As noted, Kaylianna is Decedent's minor successor in interest. Kaylianna does not have a guardian ad litem in this action. As the Magistrate Judge previously explained, a personal representative of a decedent's estate may maintain a wrongful death action on behalf of the decedent's heirs as a "statutory trustee to recover damages for the benefit of the heirs." Doc. 46 at 3 (quoting *Adams v. Superior Court*, 196 Cal. App. 4th 71, 77 (2011)). Accordingly, as the Estate's representative, Mrs. Cotta has standing to bring Plaintiffs' wrongful death claim on Kaylianna's behalf. *See* Cal. Code Civ. Proc. § 377.60 ("§ 377.60"); *Adams*, 196 Cal. App. 4th at 77 ("As a 'personal representative' of the deceased, plaintiff may maintain the [wrongful death] action on behalf of the heirs—i.e. as 'a statutory trustee to recover damages for the benefit of the heirs.'") (citation omitted).

Whether Mrs. Cotta may bring § 1983 survival claims on Kaylianna's behalf as Decedent's heir is less clear. Plaintiffs argue that Mrs. Cotta may bring the claims on behalf of all of Decedent's heirs through the Estate. *See* Doc. 67 at 11. In support, Plaintiffs cite § 377.60 and *Adams*, 196 Cal. App. 4th at 77-78. *Id.* But § 377.60 concerns wrongful death claims, which are distinct from survival claims, as the *Adams* court explained. *See Adams*, 196 Cal. App. 4th at 78-79. Specifically, "[s]urvival causes of action are governed by section 377.30," not § 377.60. *Id.* at 78; *see also Hayes v. Cnty. of San Diego*, 736 F.3d 1223, 1229 (9th Cir. 2013) ("In finding that Chelsey Hayes met California's statutory requirements to bring a survival action, the district court relied upon California Code of Civil Procedure § 377.60. The district court erred in doing so because section 377.60 relates to wrongful death actions that are based on personal injuries resulting from the death of another, not survival actions that are based on injuries incurred by the decedent."). Further, the section of *Adams* to which Plaintiffs cite concerns the plaintiff's wrongful death claim, not her survival claims. *See Adams*, 196 Cal. App. 4th at 77-78.

As explained above, only a Decedent's personal representative or successor in interest may assert a survival claim under § 377.30. *See supra* at 9; *see also Hayes*, 736 F.3d at 1229 ("While claiming she is the decedent's 'sole surviving heir,' Appellant fails to allege that she is her father's personal representative or successor in interest."). Although Kaylianna is Decedent's successor in interest, as a

minor, she lacks standing to bring a survival claim because she has no guardian ad litem.

Nonetheless, at this time, the Court DENIES Defendants' motion for summary judgment on the ground Kaylianna lacks standing. Plaintiffs shall have until January 12, 2015, to file a petition to name a guardian ad litem for Kaylianna. If Plaintiffs fail to do so, the Court will grant Defendants' motion for summary judgment as to Kaylianna for lack of standing.

**B.      Plaintiffs' First Cause of Action**

Plaintiffs' first claim is brought against Henderson under § 1983 for exhibiting deliberate indifference to Decedent's serious safety needs in violation of Decedent's Eighth and Fourteenth Amendment rights. SAC at 9. Plaintiffs allege that Henderson's "failure to take any steps or measures to account for the clear and known risk to which [Decedent] was subjected constituted deliberate indifference to [Decedent's] serious safety needs." *Id.* at ¶ 26.

As a threshold matter, the parties dispute the constitutional provision(s) under which Plaintiffs' claim is properly brought. Defendants assert Decedent's "rights were protected under the Eighth Amendment, not the Fourteenth." Doc. 60-1 at 19 (citation omitted). Defendants further claim that Plaintiffs cannot allege that Decedent suffered any constitutional injuries prior to his conviction. *Id.* Plaintiffs argue that Decedent "was a pretrial detainee to whom the Fourteenth Amendment applied" because he had not yet been sentenced at the time of his death. Doc. 67 at 14.

**1.      Deliberate Indifference Standard.**

The Supreme Court has not determined which constitutional provisions apply to detainees who have been convicted of a crime but have not been sentenced. *See Lewis v. Downey*, 581 F.3d 467, 474 (7th Cir. 2009). But the Ninth Circuit has held that "[t]he Eight Amendment's prohibition of 'cruel and unusual punishments' applies only 'after conviction *and sentence*.'" *Lee v. City of Los Angeles*, 250 F.3d 668, 686 (9th Cir. 2001) (quoting *Graham v. Connor*, 490 U.S. 386, 393 & n.6 (1989), *abrogated on other grounds by Galbraith v. Cnty. of Santa Clara*, 307 F.3d 1119, 1125-26 (9th Cir. 2002). Other federal Courts of Appeals hold the same. *See, e.g.*, *Lewis*, 581 at 474. Ultimately, whether Decedent's rights are based in the Eighth Amendment or the Fourteenth Amendment is not dispositive because the

same standard—deliberate indifference—applies to Plaintiffs' claim. *Frost v. Agnos*, 152 F.3d 1124,

1128 (9th Cir. 1998) ("Because pretrial detainees' rights under the Fourteenth Amendment are

comparable to prisoners' rights under the Eighth Amendment, however, we apply the same standards.")

(citing *Redman v. Cnty. of San Diego*, 942 F.2d 1435, 1441 (9th Cir. 1991)); *Clouthier v. Cnty. of

Contra Costa*, 591 F.3d 1232, 1241-42 (9th Cir. 2010) (deliberate indifference standard based in the

Eighth Amendment also applies to pretrial detainees).

Jail officials must provide reasonable safety for pretrial detainees. *See Farmer v. Brennan*, 511

U.S. 825, 844 (1994); *Helling v. McKinney*, 509 U.S. 25, 33 (1993). To establish that prison officials

violated Decedent's constitutional rights by failing to prevent harm to him, Plaintiffs must show that

conditions in the jail posed "a substantial risk of serious harm" and that jail officials showed "'deliberate

indifference' to . . . [his] safety." *Farmer*, 511 U.S. at 834.

"Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th

Cir. 2004). Deliberate indifference is a subjective standard. *Id.* at 837. "To establish a prison official's

deliberate indifference, an inmate must show that the official was aware of a risk to the inmate's health

or safety and that the official deliberately disregarded the risk." *Foster v. Runnels*, 554 F.3d 807, 814

(9th Cir. 2009).

Whether "a prison official had the requisite knowledge of a substantial risk is a question of fact

subject to demonstration in the usual ways, including inference from circumstantial evidence, and a fact

finder may conclude that a prison official knew of a substantial risk from the very fact that the risk was

obvious." *Farmer*, 511 U.S. at 826. "Although an inmate is required to show awareness of the risk, 'a

factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk

was obvious.'" *Foster*, 554 F.3d at 814 (quoting *Farmer*, 511 U.S. at 842). "'[I]f an inmate presents

evidence of very obvious and blatant circumstances indicating that the prison official knew the risk

existed, then it is proper to infer that the official must have known [of the risk].'" *Id.* (quoting *Simmons

v. Cook*, 154 F.3d 805, 807 (8th Cir. 1998)); *see also Conn v. City of Reno*, 591 F.3d 1081, 1097 (9th

Cir. 2009) (holding that the magnitude of the risk must be "so obvious that [the defendant] must have

been subjectively aware of it"), *vacated*, 130 S.Ct. 1871 (2011), *reinstated in relevant part*, 658 F.3d 897 (2011).

### 2. Analysis.

The parties dispute whether Defendants' housing Decedent and Parnell together exposed Decedent to a substantial risk of serious harm. For the reasons discussed below, the Court assumes—but does not decide—that Defendants exposed Decedent to a substantial risk of harm by housing Decedent and Parnell together, and first addresses whether Henderson exhibited deliberate indifference to that risk.

### a. Parnell's Motive for Killing Decedent.

As a threshold matter, the Court must resolve the parties' evidentiary disputes that bear on the asserted reasons that Parnell killed Decedent. Plaintiffs maintain that Parnell killed Decedent because Decedent's defense at trial was adverse to Parnell. Decedent did not testify at the trial; however, Decedent's attorney advanced a theory at trial that Decedent was an unwilling participant in the car chase and Parnell was wholly at fault.

The only record evidence that directly supports Plaintiffs' theory as to why Parnell killed Decedent is an excerpt of an "offense report" from the Kings County Sheriff's Department concerning the investigation into the killing of John Cotta. Doc. 65-7 ("the report"). Defendants object to the admission of the report, and "the statements contained in the excerpt" on the ground the report lacks foundation and authentication (Fed. R. Evid. 901), and constitutes inadmissible double hearsay (Fed. R. Evid. 801 & 805). Doc. 68-3 at 5.

Plaintiffs argue that the report does not lack authenticity because Defendants produced it in discovery, and they admitted to the authenticity of discovery documents. Doc. 69 at 3 (citing *Maljack Prods., Inc. v. GoodTimes Home Video Corp.*, 81 F.3d 881, 889 n.12 (9th Cir. 1996) ("documents produced by a party in discovery were deemed authentic when offered by the party-opponent")). Defendants' foundation and authentication objections are without merit and therefore are OVERRULED.

"Plaintiffs argue that the report does not contain inadmissible hearsay because it was prepared by agents of a party, i.e., Kings County, and contains statements clearly against the penal interest of Heath Parnell, who admits to murdering Cotta." *Id.* at 4. Thus, although Defendants do not identify the disputed "statements contained in the excerpt" to which they object, it appears Plaintiffs only urge the admission of the statements Parnell purportedly made that are contained in the report.

According to the report, Parnell purportedly stated: "I tested [the 'rope' made out of bedsheet] on myself before I killed him." Doc. 65-7 at 5. When asked why he killed Decedent, Parnell purportedly replied: "I told you he crossed me, all that came out in trial. He crossed me, you guys put him, put me in the house with him." Doc. 65-7 at 3; *see also id.* at 2.

Defendants assert that these statements constitute inadmissible double hearsay. Doc. 68-3 at 5. Defendants, however, do not dispute Plaintiffs' theory as to why Parnell killed Decedent. Defendants only note that Plaintiffs allege "there was a substantial risk of serious harm to [Decedent] by housing him with Parnell because they were co-defendants and had 'adverse defenses,'" Doc. 60-1 at 20, and assert that "Henderson had no knowledge of any 'adverse defenses.'" *Id.*

Plaintiffs' contention that Parnell's alleged statements contained in the report are admissible because they are against Parnell's penal interests is unavailing. Under Federal Rule of Evidence 804(b)(3), a declarant's statement that "expose[s] the declarant to . . . criminal liability" is admissible, but only if the declarant is unavailable, as defined in Federal Rule of Evidence 804(a). Plaintiffs do not argue that Parnell is unavailable, nor is there any indication that he is. Accordingly, Defendants' objection is SUSTAINED. In resolving Defendants' motion, the Court will not consider the statements contained in the report because they constitute inadmissible hearsay.

Nonetheless, the parties do not dispute that (1) Decedent and Parnell were co-defendants; (2) Decedent's defense at trial was adverse to Parnell; and (3) Parnell killed Decedent (4) the day before their sentencing. Construing this evidence in Plaintiffs' favor, as this Court must do at this stage of the litigation, *see Anderson*, 477 U.S. at 255, the Court finds that there is sufficient circumstantial evidence to support a finding that Parnell in fact did kill Decedent for Plaintiffs' proffered reasons. Accordingly,

for purposes of resolving Defendants' motion for summary judgment only, the Court presumes that Parnell killed Decedent because of Decedent's adverse defense at trial.

### b.    Whether Henderson Was Deliberately Indifferent.

Henderson's testimony demonstrates that she was not subjectively aware of any risk Parnell posed to Decedent prior to his death. Decedent submitted three separate written requests to be housed with Parnell over the course of four months in 2011. Decedent also made "multiple verbal requests" to Henderson to be housed with Parnell. Doc. 60-5, Declaration of Sgt. Shari Henderson ("Henderson Decl."), at ¶ 5. Parnell and Decedent "gave [Henderson] plenty of reasons why they wanted to be housed together." Doc. 65-4, Deposition of Sgt. Henderson ("Henderson Depo."), at 28:11. According to Henderson, Decedent "didn't know anybody in [the jail]," *id.* at 42:14-15, and Parnell and Decedent "made it very clear they wanted to be housed together, they were friends, they had friends in common, they knew each other from Tulare." Henderson Depo. at 28:8-10.

After Decedent's multiple requests, Henderson reviewed Decedent's and Parnell's "classification/housing documents and disciplinary history," including Decedent's statement that he did not anticipate problems with other inmates, and authorized them to be housed together on May 17, 2011. *Id.* at ¶ 5. Henderson testifies that, at the time, she "had no knowledge of [Decedent] and Parnell ever having any physical or verbal altercations, that Parnell every verbally or physically threatened [Decedent], or that Parnell had in any way attempted to intimidate [Decedent]." Henderson Decl. at ¶ 6. Further, Henderson "was not aware of Parnell ever being physically violent towards any inmates at the [jail]." *Id.* Nor was Henderson informed that Decedent had given any statement to law enforcement that was adverse to Parnell. *Id.* Although Decedent talked to Henderson on multiple occasions while housed with Parnell for almost one year, Henderson "never received any communication or information from anyone that Parnell threatened [Decedent's] safety." *Id.* However, both Decedent and Parnell "made comments about [how] they were going to have their court together." Henderson Depo. at 43:16.

Parnell and Decedent jointly requested to be housed in a different area in January 2012. *Id.* at ¶ 7. Henderson again reviewed Decedent's and Parnell's files to assess whether to grant their request. *Id.*

Henderson testifies that she did know of "any facts that would [have led her] to believe Parnell posed a

risk to the safety of [Decedent]." *Id.*; *see also* Henderson Depo. at 62:4-7 (Henderson testifying that she

was never aware of any "friction" between Decedent and Parnell).

Henderson was unaware that Decedent "had given a statement to any law enforcement official

that was against the interests of Parnell." UMF 28. Henderson had no knowledge that Decedent and

Parnell ever had any altercations, that Parnell ever threatened Decedent, or that Parnell had attempted to

intimidate Decedent. UMF 29. Henderson had no knowledge that Parnell pressured Decedent to request

that they be housed together. UMF 30. When Decedent made a second request in writing to be housed

with Parnell, Henderson stated: "Check w[ith] your attorney . . . . Parnell is your co-defendant: why do

you want to cell up w[ith] him?" Doc. 60-5 at 10. Henderson was unaware of Parnell ever being violent

toward any inmate at the jail, including Decedent. UMF 31. Decedent spoke with Henderson on a

number of occasions and never expressed to her that he believed that Parnell was a threat to his safety.

UMF 35. Henderson never received any information from anyone that Parnell threatened Decedent's

safety. UMF 36. Henderson testified that she still did not know why Parnell killed Decedent

approximately two years after he did so. *See* Henderson Depo. at 64:17-18. Decedent was the first

inmate killed by another inmate at the jail. *Id.* at 75:3-4.

Plaintiffs dispute Henderson's testimony. Plaintiffs argue that her "self-serving testimony as to

her state of mind and what she knew when cannot overcome the compelling circumstantial facts

showing that she was deliberately indifferent." UMF 28. Specifically, Plaintiffs assert that Henderson

(1) knew that Cotta and Parnell were codefendants, (2) was aware of the dangers inherent in co-housing codefendants, particularly when one was providing evidence against the other, (3) had access to information establishing that Cotta had given post-arrest statements against Parnell,[11] (4) had access to jail records related to Cotta's and Parnell's criminal proceedings indicating that their defenses were adverse and that Cotta's attorney had moved for separate trials, (5) had access to information from transportation officers and bailiffs who separated Cotta and Parnell because of Parnell's apparent dangerousness, (6) was aware of Parnell's dangerous background

---

[11] In support of the assertion that Parnell made post-arrest statements inculpating Parnell, Plaintiffs submit an 88-page "transcript of [Decedent's] initial statement" from June 6, 2013. Doc. 67 at 17 (citing Doc. 65-11). Plaintiffs fail to cite with any specificity where Decedent's alleged "post-arrest statements inculpating Parnell" are in the transcript. Without any guidance from Plaintiffs, the Court is unable to determine which of Decedent's post-arrest statements, if any, purportedly inculpate Parnell. As such, Plaintiffs' assertion that Decedent made post-arrest statements inculpating Parnell are without support.

and the high profile offense he and Cotta committed before being booked, (7) made no effort to gather the evidence that she herself believed could be important to obtain in determining whether codefendants should be co-housed, (8) knew that classification decisions were crucial, since inmates had substantial opportunity to do harm to one another out of the sight and control of the jail staff and their infrequent and cursory cell checks, (9) disregarded the title 15 jail classification assessment dictating that Cotta should have been housed and programmed alone, without doing any evidence gathering, (10) disregarded the marked increase in panic button activity from Cotta's and Parnell's housing area in the two months preceding the murder, (11) disregarded jail policy dictating that codefendants should not be housed together, without doing any evidence gathering, (12) disregarded Cotta's and Parnell's jail discipline history, both before and after they were co-housed, (13) did not perform or request any proactive investigation that sound jail practice dictates, (14) relied on inmates to self-report problems and request protection, although she was aware of the institutional cultural factors that militated against those thing occurring, and (15) never reassessed the propriety of Cotta's and Parnell's co-housing in the aftermath of their trial, or at any time after January 16, 2012, despite having access to information regarding the adversity of their trial defenses.

UMF 28. Plaintiffs argue that "[t]his combination of factors is sufficient to require a trial, since they 'show that the official was well aware of a risk to the inmate's health or safety and that the official deliberately disregarded the risk,'" Doc. 67 at 17 (quoting *Foster*, 554 F.3d at 814), because "Henderson was almost certainly aware of the risk of housing codefendants like [Decedent] and Parnell and did not take reasonable measures to address those risks." *Id.* at 18.

Henderson consistently and unequivocally testified that she was not subjectively aware that housing Parnell and Decedent together posed any risk to Decedent's safety. And Plaintiffs have provided no evidence that calls into question the veracity of Henderson's testimony. Nonetheless, the Court may not grant summary judgment for Henderson "simply on the basis of [her] assertions as to [her] state of mind." *Conn*, 591 F.3d at 1097. But, given Henderson's testimony, to establish that Henderson acted with deliberate indifference, Plaintiffs must provide evidence "to create an inference that the substantial risk of serious harm to [Decedent] was so obvious that [Henderson] 'must have known' of it." *Clouthier*, 591 F.3d at 1246 (quoting *Farmer*, 511 U.S. at 842); *see also Conn*, 591 F.3d at 1097.

Based on the undisputed evidence, the Court cannot find that there is sufficient circumstantial evidence to create a genuine issue of fact regarding Henderson's subjective awareness of the alleged risk that Parnell posed to Decedent . Decedent made multiple written requests to be housed with Decedent. That Decedent and Parnell were co-defendants is not dispositive, as Plaintiffs suggest. Although the jail

1   generally does not house co-defendants together, they do so when considered appropriate. Henderson

2   considered Parnell and Decedent to be friends and, in her view, had no reason to deny Decedent's

3   requests to be housed with Parnell. For almost a year, Parnell and Decedent were cellmates without any

4   known or reported altercations or problems with one another. Even after Decedent testified against

5   Parnell, there is no evidence that Parnell threatened or expressed a desire or intention to harm Decedent

6   in the approximately three weeks between their conviction and Decedent's death. Moreover, Henderson

7   was unaware of Decedent's testimony. Notably, there is no evidence that Decedent informed jail staff,

8   including Henderson, that he considered Parnell to be a threat. Simply stated, Plaintiffs have proffered

9   no evidence showing that Henderson was on notice that Parnell posed a threat to Decedent's safety.

10  Rather, the evidence shows that Henderson believed that Parnell and Decedent were friends who were

11  housed together for approximately one year without any known problems with one another. Henderson

12  therefore is entitled to summary judgment on Plaintiffs' first cause of action.[12] *See Berg v. Kincheloe*,

13  794 F.2d 457, 460 (9th Cir. 1986) (affirming grant of summary judgment where plaintiff did not provide

14  evidence demonstrating that defendants "had any reason to believe" that plaintiff would be attacked);

15  *Shelton v. Reinke*, No. 3:11-cv-64-BLW, 2013 WL 1319630, at *9 (D. Idaho Mar. 28, 2013) ("Prison

16  officials cannot be deliberately indifferent toward a purported substantial risk of harm when Plaintiff

17  fails to inform them of the risk, despite having numerous opportunities to do so."), *aff'd*, __ Fed. App'x

18  __, 2014 WL 4978301 (9th Cir. Oct. 7, 2014).

19  **B.      Plaintiffs' Second Cause of Action.**

20          Plaintiffs' second cause of action is a *Monell* claim brought against the County. SAC at 9.

21  Although neither the SAC nor Plaintiffs' opposition with regard to this claim is a model of clarity,

22  Plaintiffs' *Monell* claim appears to contain two theories of County liability.

23          First, Plaintiffs allege that the County (*i.e.*, the jail) had "a custom, policy, or practice of

24  permitting codefendants, and even convicted codefendants who both went to trial and whose defenses

---

[12] Because of this finding, the Court need not address Defendants' argument that Henderson is entitled to qualified immunity from the claim.

were adverse, to remain housed together both through trial and post-trial." *Id.* at ¶ 21. Plaintiffs further allege that the jail's "custom, policy, or practice permitted even dangerous codefendants with lengthy violent histories to be housed together, even during and after trial and even if their defenses were adverse." *Id.* Specifically, Plaintiffs assert that Defendants, "particularly Sgt. Henderson,[13] [were] on notice of the risk that [Decedent] was placed at by continuing to be housed with Parnell after their joint trial with adverse defenses resulted in a conviction." *Id.* at ¶ 19. Plaintiffs therefore maintain that "there was a clear lack of supervision and review/reconsideration of these risky placements, even in cases such as the one at issue, where the codefendants' repeated incidents and lengthy potential sentences indicated an even greater risk of harm." *Id.* at ¶ 22. Despite those risks, Parnell and [Decedent] were not separated, they were not put in protective housing, and they were not subject to increased monitoring or other safety measures. Nor were any other safety measures, such as increased staffing or widespread communication of the very discernible potential for violence, undertaken." *Id.* at 19. In sum, Plaintiffs' first theory of *Monell* liability is that the jail had an inadequate policy of housing codefendants together during their legal proceedings without keeping abreast of developments in those proceedings that may bear on the decision to keep them housed together.

Second, Plaintiffs allege that the jail "had a custom, policy or practice of grossly understaffing the jail, even in high risk areas, such as areas in which codefendants with adverse defenses were permitted to be housed together, even during and after trial." *Id.* at ¶ 23. Plaintiffs further allege that the jail "failed to promulgate appropriate policies or procedures to take other measures to prevent [Parnell killing Decedent], including by systematically understaffing the [jail] and by failing to detect and communicate inmate violence." *Id.* at ¶ 30.

---

[13] Although Defendants argue there is no evidence that Henderson "is a policymaker for the Kings County Sheriff's Department," Defendants do not dispute that Henderson's housing-related decisions concerning Decedent and Parnell were made pursuant to jail policy or that Henderson had the sole authority to make all housing-related decisions. As such, Henderson's housing-related decisions constitute official jail (*i.e.*, County) policy for purposes of Plaintiffs' *Monell* claim. *See Fuller v. City of Oakland, Cal.*, 47 F.3d 1522, 1534 (9th Cir. 1995); *see Fairley v. Luman*, 281 F.3d 913, 918 (9th Cir. 2002) ("A 'policy' is ''a deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.''" quoting *Oviatt*, 954 F.2d at 1477 (citation and quotation marks omitted)). Accordingly, to the extent Defendants argue Henderson's conduct at issue here does not amount to official jail policy because "[t]here is no evidence that . . . Henderson is a policymaker for the Kings County Sheriff's Department," Doc. 68-2 at 7, the Court disagrees.

Defendants argue that Plaintiffs' *Monell* claim fails because Decedent suffered no violation of

his constitutional rights. Doc. 60-1 at 25-26. Even assuming that he did, Defendants further argue that

the jail's housing policies are constitutional, *id.* at 26-27, and "there is no evidence that the jail was

understaffed in terms of personnel responsible for monitoring inmates." *Id.* at 27.

### 1. Standard.

"[A] local governmental body may be liable if it has a policy of inaction and such inaction

amounts to a failure to protect constitutional rights." *Oviatt v. Pearce*, 954 F.2d 1470, 1474 (9th Cir.

1992) (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). "[T]he policy of inaction must be

more than mere negligence . . . it must be a conscious or deliberate choice among various alternatives."

*Berry v. Baca*, 379 F.3d 764, 767 (9th Cir. 2004) (internal citations omitted). However, "[t]he plaintiff

need not prove that the municipality acted with actual, subjective intent." *Wilson v. Maricopa Cnty.*, 463

F. Supp. 2d 987, 992 (D. Ariz. Nov. 9, 2006) (citing *Gibson v. Cnty. of Washoe*, 290 F.3d 1175, 1186

(9th Cir. 2002)). As the Ninth Circuit recently explained,

> a policy of inaction is based on a government body's "failure to implement procedural
> safeguards to prevent constitutional violations." *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128,
> 1143 (9th Cir. 2012). In inaction cases, the plaintiff must show, first, "that [the] policy amounts
> to deliberate indifference to the plaintiff's constitutional right." *Id.* (citations omitted) (internal
> quotation marks omitted). This requires showing that the defendant "was on actual or
> constructive notice that its omission would likely result in a constitutional violation." *Id.* at 1145
> (citations omitted). Second, the plaintiff must show "that the policy caused the violation in the
> sense that the municipality could have prevented the violation with an appropriate policy." *Id.* at
> 1143 (citations omitted) (internal quotation marks omitted).

*Jackson v. Barnes*, 749 F.3d 755, 763 (9th Cir. 2014). Accordingly, a municipality may be liable under

*Monell* when it "has constructive notice that it needs to remedy its omissions in order to avoid violations

of constitutional rights." *Gibson*, 290 F.3d at 1187 n. 8. This generally occurs where "the particular

omission is *substantially certain* to result in the violation of . . . constitutional rights." *Canton*, 489 U.S.

at 1208 (O'Connor, J., concurring in part and dissenting in part) (emphasis added); *see also Conn*, 591

F.3d at 1103 ("Deliberate indifference by the municipality may be established where 'a violation of

federal rights may be a *highly predictable consequenc*e of a failure to equip law enforcement officers

with specific tools to handle recurring situations.'" (emphasis added and citation omitted)). Thus, the

Ninth Circuit "consistently has found that a county's lack of affirmative policies or procedures to guide employees can amount to deliberate indifference, even when the county has other general policies in place." *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1189 (9th Cir. 2006).

> For example, in *Gibson*, a mentally ill detainee died while in the custody of the county jail. The decedent's wife sued the county, alleging that it had acted with deliberate indifference to her husband's mental illness. The district court granted summary judgment in favor of the county. On appeal, [the Ninth Circuit] reversed and remanded, finding that the county's policy—which precluded a medical evaluation for an incoming detainee who was uncooperative, combative, or intoxicated—failed adequately to instruct the nurse on duty how to act upon medical information, including information from prescription medications, which she obtained from the detainee. The [Ninth Circuit] held that a jury could find that the omission was sufficiently likely to result in the violation of the detainee's right to medical care that the county was deliberately indifferent to those needs. 290 F.3d at 1195. "When policymakers know that their medical staff members will encounter those with urgent mental health needs yet fail to provide for the identification of those needs, it is obvious that a constitutional violation could well result." Id. at 1196.

> In *Fairley*, an arrestee who had been held in jail for twelve days as the result of a mistaken identification sued the City of Long Beach for the violation of his constitutional rights. At trial the jury found the city liable. On appeal [the Ninth Circuit] affirmed, finding that even though the city's policies and procedures had been complied with fully, the plaintiff had presented sufficient evidence to establish that the city's failure to instigate procedures to alleviate the problem of detaining individuals on the wrong warrant could constitute a policy of deliberate indifference. 281 F.3d at 918.

> And in *Oviatt*, [the Ninth Circuit] held that even though the county had a system for tracking arraignment dates for detainees, its lack of procedures to alleviate the problem of detecting missed arraignments—which resulted in the plaintiff's prolonged detention without an arraignment, a bail hearing, or a trial—was a policy of inaction that amounted to deliberate indifference to pretrial detainees' constitutional rights. 954 F.2d at 1478.

*Id.* at 1189-90. However, the Ninth Circuit "has emphasized, 'Whether a local government has displayed a policy of deliberate indifference to the constitutional rights of its citizens is generally a jury question.'" *Id.* at 1190-91 (quoting *Gibson*, 290 F.3d at 1194-95 (citation omitted)).

**2.      Analysis**

**a.      Whether Decedent Suffered a Constitutional Violation.**

Defendants argue that Decedent did not suffer a constitutional violation because Defendants' acts and omissions did not cause Decedent's death. *See* Doc. 60-1 at 25-26. Specifically, Defendants argue that neither Defendants' decision to house Decedent and Parnell together nor their alleged failure to monitor properly their cell caused Decedent's death. *See id.* at 25. Defendants therefore argue that they

1  cannot be liable for Plaintiffs' *Monell* claim." *Id.* at 26.

2      Defendants' argument puts the cart before the horse. To establish that the County is liable under

3  *Monell*, Plaintiffs must demonstrate that Decedent suffered a constitutional violation that occurred

4  because of Defendants' acts or omissions. Thus, whether Defendants' acts or omissions caused

5  Decedent to suffer a constitutional deprivation is separate and distinct from—and necessarily contingent

6  on— whether Decedent in fact suffered a constitutional deprivation. *See Farmer*, 511 U.S. at 833-84

7  (holding that, although prison officials must take reasonable steps "to protect prisoners from violence at

8  the hands of other prisoners . . .[i]t is not, however, every injury suffered by one prisoner at the hands of

9  another that translates into constitutional liability for prison officials responsible for the victim's

10  safety").

11      Decedent had a right to protection from violence by other inmates while housed at the jail. *See*

12  *Neely v. Feinstein*, 50 F.3d 1502, 1508 (9th Cir. 1995) (finding "clearly established" that patients have a

13  "constitutional right to be safe in the state institutions to which they are committed"); *Youngberg v.*

14  *Romeo*, 457 U.S. 307, 315 (1982) ("[T]his Court has noted that the right to personal security constitutes

15  a 'historic liberty interest' protected substantively by the Due Process Clause"). That Decedent was

16  killed by his cellmate in the middle of the night while housed in their cell demonstrates that Decedent's

17  constitutional right to safety was violated. *See Farmer*, 511 U.S. at 534 ("Being violently assaulted in

18  prison is simply not part of the penalty that criminal offenders pay for their offense against society.").

19  Defendants' motion for summary judgment is DENIED to the extent it is premised on Defendants'

20  argument that Decedent suffered no constitutional deprivation.

21      **b.    Whether the Jail's Housing Policy Constitutes Deliberate Indifference.**

22      Plaintiffs allege that the jail's housing policy is constitutionally inadequate because it permitted

23  co-defendants, including Parnell and Decedent, whose legal defenses were adverse to one another, to

24  remain housed together before and after being tried and convicted. Plaintiffs allege that because the

25  County and its employees, particularly Henderson, knew that housing Decedent and Parnell together

26  posed a serious risk of harm to Decedent, the County's decision to keep them housed at all times

constitute deliberate indifference to Decedent's constitutional rights. Plaintiffs further argue that the jail's housing policy is constitutionally inadequate in that it did not require jail staff, namely, Henderson, to gather evidence about co-defendants' legal proceedings to assess whether to house co-defendants together or keep them housed together after doing so. Plaintiffs assert that, had the jail's housing policy required Henderson to keep abreast of Decedent's and Parnell's legal proceedings, she would have learned of their adverse defenses and would have (or should have) housed them separately. Thus, Plaintiffs' *Monell* claim concerning the jail's housing policy appears to boil down to (1) whether the County (*i.e.*, Henderson) had an affirmative obligation to gather evidence and information concerning Decedent's adverse trial defense; and (2) whether the jail was obligated to ensure that any such evidence and information is communicated to the appropriate housing authorities at the jail (*i.e.*, Henderson).

### 1.  Evidence Concerning the Jail's Housing Policy.[14]

Henderson testified that one reason co-defendants may not be housed together is because they disagree "on how to go about their court proceedings." Henderson Depo. at 28:1; *see also id.* at 24:14-18 ("if you gather information and there are indicators that maybe co-defendants shouldn't be housed together, either because they are—the way their court proceedings are going or they could be providing information"). She testified that "sometimes situations become evident during the course of their court proceeding." *Id.* at 31:1-2. In those instances, she talks with the jail staff the transports inmates to and from court proceedings to determine how those proceedings went, and "if something comes up, they will automatically let [her] know." *Id.* at 30:24-31:31

Henderson testified that she has the ability to determine whether an inmate has given a statement inculpating another inmate, *id.* at 52:14-20, and in those instances, "you absolutely do not want to put those people together." *Id.* at 26:23-27:8. Henderson explained that so-called "snitches"—inmates who give statements inculpating another inmates—are "placed in protective custody and . . . can't return from

---

[14] Defendants have made dozens of objections to the overwhelming majority of Plaintiffs' evidence. *See generally* Doc. 68-1. The Court has considered those objections, as well as Plaintiffs' responses to them, but will not rule on every objection individually. Rather, the Court will only rule on evidentiary objections that are material to resolving Defendants' motion. *See Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010) (holding that district court "must . . . rule on evidentiary objections that are material to its ruling"). Similarly, although the Court has reviewed all of the parties' evidence, the Court will only discuss that which is necessary to resolve Defendants' motion.

1  that." *Id.* at 32:21-33:3.

2      In the past, Henderson has denied co-defendants' requests to be housed together because she

3  perceived them to be adverse to one another. *Id.* at 68:2-7. In those instances, Henderson received

4  information from the District Attorney's office, other inmates, the inmates themselves, attorneys, law

5  enforcement, or jail staff. *Id.* at 68:8-18; *see also id.* at 31:1-4. In the absence of information given to her

6  concerning any perceived risk of housing co-defendants, Henderson relies on her own observations. *Id.*

7  at 31:23-32:4. She will talk with inmates in person in making her housing decisions. *Id.* at 33:8-14.

8      Henderson testified that, had she known Decedent made a statement to the effect that "he was

9  essentially along for the ride [during the chase] and that Parnell was the one who really caused" it, it

10  "absolutely" would have played a role in her decision to co-house them. *Id.* at 29:5-13. She explained

11  that it would have been a concern to her because

12      [She] would want to know what kind of statement did [Decedent] make . . . . Had [she] been told
   that he talked to law enforcement, [she] would want to know what they talked about because it

13      sounds as though if he gave information on a criminal case, then [she] would want to know that.

14  *Id.* at 29:18-23. Henderson did not attempt to determine the status of Decedent's and Parnell's case prior

15  to housing them. *Id.* at 50:18-21.

16      Plaintiffs provide testimony from Christopher Caine ("Caine"), who represented Decedent at his

17  trial in March 2012. Doc. 65-4, Deposition of Christopher Caine ("Caine Depo."), at 10:16-18. Caine

18  testified that he was "really concerned" when he learned that Decedent and Parnell were housed together

19  as cell mates.[15] *Id.* at 18:15-20. He explained that he was concerned because he considered Parnell to be

20  a "complete and utter psychopath," *id.* at 17:25, and his "representation of [Decedent] was adversarial to

21  that of Parnell." *Id.* at 20:4-5. Caine expressed his concern about Decedent's being housed with Parnell

---

22  [15] Defendants object to Plaintiffs' use of this aspect of Caine's testimony on the ground that "Mr. Caine told a court bailiff

23  that [Decedent] and Parnell should not be housed together at the courthouse, not at the jail." Doc. 68-1 at 19. Caine's
   testimony is ambiguous on this point. When asked whether he had informed "anyone at the [jail] that [Decedent] and Mr.

24  Parnell should not be housed together as *cell mates*," Caine responded: "If you consider the Court bailiffs as representatives
   [of the jail], I did, yes." Caine Depo. at 24:21-25 (emphasis added). When asked whether he "informed a court bailiff that
   [Decedent] and Mr. Parnell should not be housed as cell mates in the [jail]," Caine replied "[a]t the Kings County court cell."

25  *Id.* at 25:1-7. Counsel for Plaintiffs explained, "I'm talking about the housing at the Kings County jail, not housing at the
   courthouse in the cells." *Id.* at 25:22-23. And when asked if he had "inform[ed] anyone else employed by Kings County that

26  Mr. Parnell and [Decedent] should not be housed together as *cell mates at the* [*jail*,]" Caine testified that he "expressed the
   belief that they shouldn't." *Id.* at 25:8-16.

to the court bailiffs at the County courthouse. *Id.* at 24:20-25:13. Caine expressed the belief that [Decedent

and Parnell shouldn't" be housed together, *id.* at 25:14-16,[16] because Parnell posed a threat to

Decedent's safety due to "what happened in the vehicle involved in the commission of [Parnell's and

Decedent's] crimes." *Id.* at 30:12-21. According to Caine, he talked with the bailiffs that "there was

something missing, something loose with [Parnell]," and "[i]t's for that reason that the bailiffs wouldn't

have them in the same cell." *Id.* at 28:21-29:4-5.[17] Caine discussed with court bailiffs his belief that

Parnell posed a danger to Decedent's safety "on a few occasions." *Id.* at 28:10-16. Caine does not recall

expressing his concern about Decedent and Parnell being housed together to any other County staff. *See*

*id.* at 27:22-28:16.

Plaintiffs also provide testimony from Carlos Navarette ("Navarette"), who prosecuted the case

against Decedent and Parnell. Doc. 65-4, Deposition of Carlos Navarette ("Navarette Depo."), at 5:22-

25. Navarette testified that Decedent made post-arrest statements that inculpated Parnell and that those

statements were admitted into evidence while Parnell was present. *Id.* at 8:6-17. Navarette recalled that

Parnell was present for Caine's closing statement, during which Caine "vociferously" argued that

Decedent was an unwilling participant in the chase and that Parnell was at fault. *Id.* at 10:9-19.

Plaintiffs deposed Clark Sida, Defendants' jail procedures expert, who has served as a

classification officer. *See* Doc. 65-4, Deposition of Clark Sida ("Sida Depo."), at 2, 8:21-22, 12:1-2.

Sida testified that there "could be" potential risks associated with housing codefendants. *Id.* at 8:1-5.

Specifically, Sida testified that

> the only risk that really comes to my mind is if it were known that there was testimony given or
> that one of the individuals that was housed in the cell had—let's just say, for lack of a better
> word, snitched on his—the other person in the cell, that could be a problem if that were known.

---

[16] Defendants object to the admission of this testimony on hearsay and relevance grounds. Doc. 68-1 at 18. Defendants'
relevance objection is OVERRULED because the testimony is relevant to a core issue of whether the jail was on notice of the
potential risk Parnell posed to Decedent. Defendants' hearsay objection also is OVERRULED because the statement is non-
hearsay and thus permissibly proffered to show that Defendants were on notice of Caine's opinion that Parnell and Decedent
should not be housed together.

[17] Defendants object to this testimony on hearsay and relevance grounds, explaining that it "is in reference to [Decedent] and
Parnell being in the same cell in the courthouse. There is no reference to the [jail]." Doc. 68-1 at 18. Defendants' objections,
therefore, appear to be in response to Plaintiffs' characterization of the testimony, *see id.*, not with the substance of the
testimony itself. Accordingly, Defendants' objections are OVERRULED.

*Id.* at 8:12-17. If he had been in Henderson's position and was aware that Decedent had given a post-arrest statement inculpating Parnell, Sida stated that:

> [he] would give it a fair amount of gravity in terms of how [he] was making that [housing] decision . . . [because] it could indicate that there was personal animosity between the two or there might be a sense of payback from the individual to whom the negative statements were directed at.

*Id.* at 13:10-18. Sida would have wanted to know whether Decedent had made a statement inculpating Parnell "because that would be a piece of information that would indicate that there might be a problem in co-housing the two individuals in terms of safety." *Id.* at 37:8-19. Sida explained that "there's a strong jail/prison ethos that one person doesn't snitch on another, and that often can cause a real problem between two individuals even if it's just suspected." *Id.* at 37:22-25. Sida testified, however, that classification officers "generally . . . don't do an exhaustive investigation of an inmate's court case unless there's some cause to do so." *Id.* at 38:25-39:1. Such cause generally comes from information "provided by the arresting officer or, most importantly, the individuals themselves . . . because they have the most to lose by being improperly housed with the wrong person." *Id.* at 40:3-7.

Plaintiffs provide testimony from Senior Deputy Rosalie Garcia-Gonzales, who considers herself to be the most qualified individual at the jail with regard to the jail's safety, security, and cell monitoring. Doc. 65-4, Deposition of Rosalie Garcia-Gonzales ("Garcia-Gonzales Depo."), at 7:10-16. Garcia-Gonzales noted that, pursuant to the jail's housing, codefendants generally are not housed together for security reasons. *Id.* at 25:15-23. In her view, there is a security issue with housing codefendants together "if there's an issue with [them] testifying against each other." *Id.* at 25:24-26:2.

Plaintiffs submitted a report from Assistant Sheriff (Ret.) Michael Hackett, Doc. 65-3, Report of Michael Hackett ("Hackett Rep."), and Defendants submitted an excerpt from Hackett's deposition. *See* Doc. 60-3 at 9, Declaration of Michael Hackett ("Hackett Depo."). Hackett testified that, in his view, the jail's classification policy "comport[s] with . . . modern practices," and Decedent and Parnell were appropriately classified pursuant to it. *Id.* at 9-10. Hackett opined, however, that "an experienced classification officer knows, or reasonably should know that housing co-defendants together in the same

cell is a dangerous practice for a host of reasons. Hackett Rep. at 31, ¶ 76. Hackett listed a number of reasons, including: "Co-defendants can continue their criminal activities and conspiracies while in custody. They can discuss their case and concoct stories to avoid punishment . . . one party may make statements against the interests of the other and then be subjected to retaliation and violence." *Id.*

### 2. Analysis.

Plaintiffs do not state explicitly whether they contend that Defendants were on actual or constructive notice. In the SAC, Plaintiffs allege that Defendants were "put . . . on notice of the risk that [Decedent] was placed at by continuing to be housed with Parnell after their joint trial." SAC at ¶ 19. The SAC contains no other allegations concerning whether Defendants were on actual or constructive notice. But, as discussed above, Plaintiffs identify fifteen "circumstantial facts" that they argue demonstrate that Henderson "was almost certainly aware of the risk of housing codefendants like [Decedent] and Parnell." Doc. 67 at 17-18; UMF 28. Given these assertions, the Court construes Plaintiffs' position to be that that Defendants were on constructive notice that the jail's housing policy was likely to result in constitutional violations.

Because Plaintiffs argue that Defendants were on constructive notice of inadequacies in the jail's housing policy, to succeed on their *Monell* claim Plaintiffs must demonstrate that "the need to remedy the omission 'is so obvious, and the inadequacy so likely to result in the violation of constitutional rights . . . [that Defendants] can reasonably be said to have been deliberately indifferent to the need." *Gibson*, 290 F.3d at 1195 (quoting *Canton*, 489 U.S. at 390); *see also Desert Palace*, 698 F.3d at 1145 ("Tsao has not alleged that Desert Palace had actual notice of the flaw in its policies. The question thus becomes whether the risk that security personnel might arrest someone who had been invited to the casino was so 'obvious' that ignoring it amounted to deliberate indifference."). Here, the omissions are (1) the jail's lack of a policy to affirmatively gather evidence and information concerning codefendants' legal proceedings that may bear on the jail's decision to house those codefendants together; and (2) the jail's lack of a policy to ensure that any such evidence and information is communicated to the appropriate housing authorities at the jail.

To the extent Plaintiffs argue that the jail's housing Decedent and Parnell together in and of itself constitutes deliberate indifference due to their status as co-defendants, the undisputed evidence demonstrates otherwise. The record establishes (and Defendants do not dispute) that although co-defendants generally are not housed together pursuant to the jail's policy, they may be housed together on a case-by-case basis. But Henderson, Sida, and Hackett—Plaintiffs' expert—all testified that co-defendants may be kept separate for reasons unrelated to their security, including the need to separate them so they cannot further a criminal conspiracy, discuss ways to avoid conviction, or divulge privileged information in an effort to hinder the other's legal defense. For instance, after Decedent made a second request in writing to be housed with Parnell on February 8, 2011, Henderson instructed Decedent to "check w[ith his] attorney," which seemingly suggests that, in considering the request, the only concern she had about co-housing Decedent and Parnell was due to how it could affect their legal proceedings. Moreover, as discussed above, Henderson had no reason to believe that Parnell posed any danger to Decedent, and thought that they were friends for the approximately eleven months they were housed together. Accordingly, housing Decedent and Parnell together did not, by itself, constitute deliberate indifference to Decedent's security.

Henderson testified that she has denied co-defendants' housing requests because of a perceived legal adversity between them. However, there is no evidence that the jail has experienced analogous situations to the one at issue here. That is, there is no evidence of violence between other co-defendants housed together at the jail, who were amicable until one, unbeknownst to Henderson, took a legal position adverse to the other at trial. Beyond Decedent's case, there is no evidence that the jail's failure to affirmatively gather evidence regarding potential security risks associated with housing co-defendants has ever resulted in violence between co-defendants (or any potential other constitutional violations). Rather, the undisputed evidence shows that adversity between co-defendants that may arise due to their respective legal positions that would justify separating them generally is brought to the jail's attention through, among other individuals, the co-defendants' attorneys, the District Attorney's office, jail transportation staff, other inmates, or the co-defendant(s). Here, however, the undisputed evidence

shows that Henderson was unaware of Decedent's adverse trial defense, no one brought it to her

attention, and she had no reason to inquire into it.

Thus, there is no indication that Henderson's failure to investigate proactively and to monitor

Decedent's legal proceedings was likely to result in a constitutional violation. Simply stated, there is no

evidence that Henderson was on notice that her not actively gathering information concerning

Decedent's legal proceedings was likely to result in the constitutional injury that Decedent suffered. *See*

*Desert Palace*, 698 F.3d at 1145 ("Similarly, the absence here of any evidence of a pattern makes it far

less likely that Tsao can prove Desert Palace was 'on actual or constructive notice' . . . that its policy

would lead to constitutional violations."). Thus, Plaintiffs have failed to provide sufficient facts to show

that the jail's lack of a policy requiring Henderson (or others) to gather proactively evidence concerning

co-defendants' legal proceedings presented a risk so obvious that ignoring it amounted to deliberate

indifference. *See id.* Defendants' motion for summary judgment on *this aspect* of Plaintiffs' *Monell*

claim is GRANTED.

This conclusion, however, does not resolve Plaintiffs' claim that the jail exhibited deliberate

indifference by failing to implement a policy to ensure that information relevant to the decision to house

co-defendants together is communicated to the appropriate housing authorities at the jail. The

undisputed evidence indicates that Caine informed County bailiffs during Parnell and Decedent's joint

trial that he believed that they should not be housed together as cell mates because Parnell posed a threat

to Decedent's safety. Defendants do not address this issue in their briefs.

There is no indication in the record that the County or the jail had any policy in place that

*requires* County staff to relay information that may affect inmate safety to the jail's housing authorities.

As Henderson testified, when she learns of information that an individual (*e.g.*, an inmate's attorney)

believes there exists a risk to an inmate's safety, she takes it into account and, if appropriate, will adjust

that inmate's housing accordingly. In fact, Henderson operated under the assumption that jail staff who

transport inmates to and from court proceedings will monitor the proceedings and "if something comes

up, they will automatically let [her] know." Henderson Depo. at 30:24-31:31. But, as discussed,

1   Henderson was not informed of any perceived risk posed by Parnell – including the risk that Caine

2   perceived and conveyed to the County bailiffs "on a few occasions." The County bailiffs were made

3   aware of a perceived risk to Decedent's safety, yet they did nothing in response, and there is no

4   indication that their failure to act violated any County or jail policy. At minimum, there is a genuine

5   issue of material fact as to whether it was likely that constitutional violations would result from the

6   County's apparent failure to implement a policy and procedure requiring its employees to inform the

7   jail's housing authorities of a perceived risk to inmate safety that is explicitly brought to their attention.

8   Similarly, a genuine issue of material fact exists as to whether the jail's lack of such a policy caused the

9   violation of Decedent's constitutional rights "in the sense that the [jail] could have prevented the

10  violation with an appropriate policy." Accordingly, Defendants' motion for summary judgment on

11  Plaintiffs' *Monell* claim based on the jail's housing policy is DENIED.

12          **c.**        **The Jail's Staffing.**

13          Plaintiffs allege that the jail "had a custom, policy or practice of grossly understaffing the jail,

14  even in high risk areas, such as areas in which codefendants with adverse defendants were permitted to

15  be housed together, even during and after trial." SAC at ¶ 23. Plaintiffs allege that the jail and

16  Henderson were "on notice of the risk that [Decedent] was placed at by continuing to be housed with

17  Parnell," and that "[d]espite those risks, [they] were not separated, they were not put in protective

18  housing, and they were not subject to increased monitoring or other safety measures. Nor were any other

19  safety measures, such as increased staffing or widespread communication of the . . . potential for

20  violence, undertaken." *Id.* at ¶ 19. Plaintiffs contend that Defendants' failure to adequately staff and

21  monitor the jail is "the only explanation for how Parnell was able to make and keep a deadly weapon in

22  his cell, i.e., the makeshift rope he used to kill [D]ecedent." *Id.* at ¶ 23.

23          Defendants argue in conclusory fashion that "there is no evidence that the jail was understaffed

24  in terms of personnel responsible for monitoring inmates" without any further argument or explanation.

25  Because Plaintiffs bear the burden of their claims, Defendants "can prevail merely by pointing out that

26  there is an absence of evidence to support the nonmoving party's case." *Soremekun*, 509 F.3d at 984

1    (citing *Cortez*, 477 U.S. at 323). But Defendants provide no argument or evidence to rebut Plaintiffs'

2    claim that, had the jail been adequately staffed, Parnell would not have had the opportunity and ability to

3    make a deadly weapon nor would he have had the ability and opportunity to kill Decedent.

4            Plaintiffs' understaffing claim is, in part, embedded in and bootstrapped onto their jail housing

5    policy claim. The undisputed evidence establishes that Decedent died between 12:40A.M. and 1:40A.M.

6    on April 23, 2014, and that he could have died within minutes. The undisputed evidence also shows that

7    jail deputies checked on Parnell and Decedent's cell at approximately 12:30A.M., and at approximately

8    1:30A.M. on April 23, 2014. Thus, to have prevented Parnell from killing Decedent, the jail would have

9    had to have separated them or have kept a more vigilant watch on their cell.

10           But, as discussed above, the Court finds that the undisputed evidence demonstrates that the jail's

11   staff did not know of any potential danger Parnell posed to Decedent. Parnell and Decedent had been

12   housed together for almost a year without any known problems. The jail therefore had no reason to

13   change their standard monitoring procedures or bolster their staff on duty on the night of Decedent's

14   death. Further, Plaintiffs do not dispute that the jail's policy concerning cell checks and searches

15   complied with Title 15. Given these circumstances, there is no evidence that the jail's staffing policy on

16   the night of Decedent's death was lacking such that "the need to remedy [the staffing policy] '[was] so

17   obvious, and the inadequacy so likely to result in the violation of constitutional rights . . . [that

18   Defendants] can reasonably be said to have been deliberately indifferent to the need." *Gibson*, 290 F.3d

19   at 1195 (quoting *Canton*, 489 U.S. at 390). Accordingly, Defendants' motion for summary judgment as

20   to Plaintiffs' *Monell* claim based on the jail's alleged understaffing is GRANTED.

21   **C.      Plaintiffs' Fourth Cause of Action.**

22           "Mrs. Cotta, Individually and as Representative of the Cotta Heirs," brings Plaintiffs' fourth

23   cause of action; the Estate does not assert the claim. *See* SAC at 11. Plaintiffs' fourth cause of action is

24   brought against Defendants under § 1983 on the ground their conduct resulted in their loss of familial

25   relations with Decedent in violation of their rights under the Due Process Clause of the Fourteenth

26   Amendment. SAC at ¶¶ 38-41. Parents and children of a decedent "may assert Fourteenth Amendment

substantive due process claim "if they are deprived of their liberty interest in the companionship and society of their child or parent through official conduct." *Chien Van Bui v. City & Cnty. of San Francisco*, No. C 11-4189 LB, __ F. Supp. 2d __, 2014 WL 3725843, at *13 (N.D. Cal. July 25, 2014) (collecting cases). Accordingly, Mrs. Cotta and Madison, as Decedent's mother and child, respectively, have standing to bring a Fourteenth Amendment claim.[18]

### 1. Standard.

As another judge of this Court recently explained:

> The due process claim protects the right to familial relations between family members. *See, e.g.,* *Stanley v. Illinois*, 405 U.S. 645, 651 (1972) ("The integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment.") (citing *Meyer v. Nebraksa*, 262 U.S. 390, 399 (1923)). However, only official conduct that "shocks the conscience" is cognizable as a due process violation. *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (citing *Rochin v. Cal.*, 342 U.S. 165, 172-73 (1952)). The threshold question in such cases is "whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Lewis*, 523 U.S. at 847 n. 8. The type of conduct which is most likely to rise to the "conscience-shocking level" is "conduct intended to injure in some way unjustifiable by any government interest." *Id.* at 849. Conduct which was not intentional, but rather was deliberately indifferent, may nevertheless rise to the conscience-shocking level in some circumstances. *Id.* at 849-50.

*Willard v. Calif. Dep't of Corrections & Rehab.*, No. 1:14-cv-760-BAM, 2014 WL 6901849, at *5 (E.D. Cal. Dec. 5, 2014).

Whether the deliberate indifference standard or the "purpose to harm" standard applies turns on the facts of the case. *See Duenez v. City of Manteca*, No. CIV. S-11-1820 LKK/KJN, 2013 WL 6816375, at *14 (E.D. Cal. Dec. 23, 2013). The "purpose to harm" standard generally applies only to situations where a government actor must make "snap judgments because of an escalating situation" because actual deliberation is not practical. *See Gantt v. City of Los Angeles*, 717 F.3d 702, 707 (9th Cir. 2013) (quoting *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010)). The "purpose to harm" standard certainly does not apply here. *See Duenez*, 2013 WL 6816375, at *14 ("the 'purpose to harm' standard is appropriate for situations involving high-speed car chases, shoot-outs, and armed suspects"). The Court therefore will apply the deliberate indifference standard to Plaintiffs' claim.

---

[18] Kaylianna would have standing to bring a Fourteenth Amendment claim if represented by a guardian ad litem, as explained above.

The Ninth Circuit recently explained that the "shocks the conscience" standard is "is satisfied . . . by conduct that either consciously or through complete indifference disregards the risk of an unjustified deprivation of liberty." *Tatum v. Moody*, 768 F.3d 806, 820-21 (9th Cir. 2014) (citing *Gantt*, 717 F.3d at 707). Thus, a wide variety of conduct has been found to "shock the conscience" in violation of the due process clause of the Fourteenth Amendment.

The Supreme Court first applied the "shocks the conscience" test in *Rochin v. California*, 342 U.S. 165, 209-10 (1952), "where [the Court] found the forced pumping of a suspect's stomach [to obtain evidence he purportedly swallowed] enough to offend due process as conduct 'that shocks the conscience' and violates the 'decencies of civilized conduct.'" *Lewis*, 523 U.S. at 846.

In *Marsh v. Cnty. of San Diego*, 680 F.3d 1148, 1155 (9th Cir. 2012), the Ninth Circuit held that a prosecutor's release of a copy of the plaintiff's child's autopsy photograph to the media violated the plaintiff's Fourteenth Amendment due process rights. The court reasoned:

> Mutilation of a deceased family member's body, desecration of the burial site and public display of death images are the kind of conduct that is likely to cause the family profound grief and therefore "shocks the conscience" and "offend[s] the community's sense of fair play and decency."

*Id.* (quoting *Rochin*, 342 U.S. at 172-73). Thus, the prosecutor's "intrusion into the grief of a mother over her dead son—without any legitimate governmental purpose—'shocks the conscience' and therefore violate[d] [the plaintiff's] substantive due process right." *Id.*

The court found in *Dau v. Cnty. of Imperial*, No. 12-cv-432 DMS (PCL), 2013 WL 2295463, at *12 (S.D. Cal. May 24, 2013), that a genuine issue of material fact existed as to whether the defendants' conduct shocked the conscience. In that case, after the plaintiff was arrested by the officer-defendants, she

> was placed in a safety cell and provided with no medical treatment save for medications for pain and alleged psychosis. She was repeatedly observed lying naked in her cell, and after her death, was found to have a "3 cm, stage II decubitus ulcer" on her lower middle back . . . . On the morning of her death, one officer commented that [the plaintiff] "looked dead," yet she was transported to the hospital in a custody van with no medical personnel or equipment save for a first aid kit. She was pronounced dead shortly thereafter.

*Id.*

Conversely, in *Breithaupt v. Abram*, the Supreme Court found "that there is nothing 'brutal' or 'offensive' in the taking of a sample of blood when done, as in this case, under the protective eye of a physician." 352 U.S. 432, 435 (1957) (quoting *Rochin*, 342 U.S. at 209). The Court therefore found "that a blood test taken by a skilled technician is not . . . 'conduct that shocks the conscience." *Id.* (quoting *Rochin*, 342 U.S. at 172).

Likewise, in *Rosenbaum v. Washoe Cnty.*, 663 F.3d 1071, 1079 (9th Cir. 2011), the Ninth Circuit found that the defendant's conduct did "not come close to rising to the level of conduct that 'shocks the conscience.'" In that case, the plaintiff asserted that the defendant violated his Fourteenth Amendment due process rights

> when he handcuffed [the plaintiff] in front of his children, escorted the children to their mother, asked them whether [the plaintiff] had been selling tickets and whether they knew what he was doing was wrong, and told them that it "was wrong" and that he was going to jail for it.

*Id.* The Ninth Circuit held that these facts did not "rise to the level of a constitutional violation." *See id.* at 1079-80.

Courts are split on the issue of whether determining if conduct "shocks the conscience" is an issue of law for the court to decide or if it is an issue reserved for the jury. *Compare Terrell v. Larson*, 396 F.3d 975, 981 (8th Cir. 2005) (en banc) ("Because the conscience-shocking standard is intended to limit substantive due process liability, it is an issue of law for the judge, not a question of fact for the jury.") *with Patrick v. Great Valley School Dist.*, 296 Fed. App'x 258, 262 (3d Cir. 2008) ("[W]e hold that a rational jury could find that Coach Brown's conduct exhibited a level of culpability that shocks the conscience"). But the Supreme Court and the Ninth Circuit have indicated that whether conduct shocks the conscience can be an issue of law that the Court may decide based on the undisputed facts. In *Collins v. Harker Heights*, the Supreme Court sustained the dismissal of the complaint, rejecting the plaintiff's argument that the defendant's conduct was "arbitrary, or conscience shocking, in a constitutional sense." 503 U.S. 115, 126-28; *see also City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 753 (1999) (Souter, J., concurring in part and dissenting in part) ("Substantive due process claims are, of course, routinely reserved without question for the court" (citing *Lewis*, 523 U.S.

at 853-855. *Marsh* came to the Ninth Circuit on an appeal from a grant of summary judgment to the

defendant. 680 F.3d at 1152. The Ninth Circuit did not explicitly hold that the defendant's conduct

"shocks the conscience" *as a matter of law*, *see id.* at 1155-56, but the court gave no indication that the

issue was one for a jury to decide. *See id.*; *see also id.* at 1156 n.3 (the defendant's "attempt to publish

the autopsy photograph is sufficiently shocking to violate Marsh's substantive due process right").

Similarly, *Rosenbaum* came to the Ninth Circuit on an appeal from a grant of summary judgment in

favor of the defendant and, based on the undisputed facts, the Ninth Circuit held that the defendant's

conduct "does not 'shock the conscience.'" 663 F.3d at 1080.

Thus, it appears that the Supreme Court and Ninth Circuit hold that the determination of whether

conduct "shocks the conscience" may be an issue of law that the Court may decide based on the

undisputed facts. *See, e.g.*, *id.*; *Preschooler II v. Clark Cnty. School Bd. of Trustees*, 479 F.3d 1175,

1181 n.5 (9th Cir. 2007) ("Even assuming a legitimate due process claim under the Fourteenth

Amendment, it takes no further analysis to conclude that these actions do not 'shock the conscience.'"

(citation omitted)); *Crowe v. Cnty. of San Diego*, 608 F.3d 406, 432-33 (9th Cir. 2010) (reversing the

district court and holding that the defendant's interrogation techniques of minors "shocked the

conscience")); *Hernandez v. Kennedy*, __ Fed. App'x __, 2014 WL 6956890, at *3 (9th Cir. Dec. 10,

2014) ("This case is troubling, but we are unable to conclude that Hernandez established a genuine issue

of material fact for a substantive due process claim"). But the Ninth Circuit has not held that the court—

not the jury—*must* decide whether official conduct "shocks the conscience."

In fact, the Ninth Circuit's decision in *A.D. v. Calif. Highway Patrol*, 712 F.3d 446 (9th Cir.

2013) strongly suggests (if not establishes) that a jury properly may decide the issue. In *A.D.*, the

plaintiffs brought a § 1983 case against a peace officer on the ground their conduct violated their

Fourteenth Amendment due process rights when he shot and killed their mother. 712 F.3d at 450-52.

The peace officer

> moved for summary judgment, asserting that he was entitled to qualified immunity. The district
> court denied the motion. The court reasoned that, based on the Plaintiffs' showing, a reasonable
> jury could find that [the peace officer] used deadly force with a purpose to harm [the plaintiffs'
> relative] unrelated to a legitimate law enforcement objective. Such conduct violated the clearly

established law set out in *L. W. v. Lemm*, 52 U.S. 833.

*Id.* at 451. The case then proceeded to trial. *Id.* After the plaintiffs' submitted their case, the peace officer moved for judgment as a matter of law ("JMOL"), which the district court denied. *Id.* at 451.

The district court's jury instructions "specified that the jury should find that [the peace officer] violated Plaintiffs' due process rights if he 'acted in a manner which shocks the conscience.'" *Id.* at 456 n.5. "[T]he instructions defined 'shocks the conscience' as 'act[ing] with a purpose to cause [the plaintiffs' mother's] death unrelated to the legitimate law enforcement purposes of taking her into custody, self-defense, or the defense of others," and "[h]aving received these instructions, the jury unanimously concluded that [the peace officer] had violated Plaintiffs' due process rights." *Id.*

After the jury returned its verdict, the peace officer filed a renewed JMOL motion on the ground he was entitled to qualified immunity, which the district court denied. *Id.* at 452-53. The peace officer appealed the district court's denial of his renewed JMOL motion, among other things. *See id.* On appeal, the Ninth Circuit affirmed, reasoning that "the district court correctly concluded that, on the facts as the jury found them, [the peace officer] violated clearly established law." *Id.* at 460. In rejecting the peace officer's claim that he was entitled to qualified immunity, the Ninth Circuit noted that "clear precedent has established that a police officer violates the Fourteenth Amendment due process clause if he kills a suspect when acting with the purpose to harm, unrelated to a legitimate law enforcement objective." *Id.* at 450. The court thus held "once a jury has found (with reasonable support in the evidence) such a due process violation on the part of the officer, he may not successfully assert qualified immunity in a post-verdict motion for judgment as a matter of law." *Id.*

The Ninth Circuit noted that the peace officer did not "attack[] the sufficiency of the evidence to support the jury's verdict" on appeal, but nonetheless held that "even if he had done so here, we agree with the district court that there was sufficient evidence to support the jury's verdict at trial." *Id.* at 458. Specifically, the Ninth Circuit found that "the evidence supports the reasonable inference that [the peace officer] acted with the purpose to harm unrelated to a legitimate law enforcement objective." *Id.*

Accordingly, in light of *A.D.*, it appears that a jury properly may decide whether official conduct

"shocks the conscience" in violation of an individual's Fourteenth Amendment due process rights.

## 2. Analysis.

For the reasons discussed above, there is not evidence that Henderson acted with deliberate indifference. Accordingly, Defendants' motion for summary judgment on Plaintiffs' fourth cause of action is GRANTED as to Henderson.

Whether the County is entitled to summary judgment on the claim is less clear. Because the Court finds that Henderson did not act with deliberate indifference, Plaintiffs' Fourteenth Amendment due process claim can be based only on the County's conduct. Plaintiffs allege, among other things, that due to the County's "customs, policies, and/or practices . . . Mrs. Cotta and the Cotta heirs were deprived of their respective son and father and suffered . . . injuries and damages [as a result]." SAC at ¶ 40.

Cases finding a violation of a Fourteenth Amendment due process right to familial relations generally are based on a government actor's affirmative conduct that violates the right. *See Porter*, 546 F.3d at 1137 ("In our cases . . . we have distinguished the 'purpose to harm" standard from the "deliberate indifference' standard, recognizing that the overarching test under either is whether the *officer's conduct* 'shocks the conscience.'" (emphasis added)). This makes sense given that (1) "[t]he threshold question . . . is 'whether *the behavior of the governmental officer* is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience," *Lewis*, 523 U.S. at 847 n. 8 (emphasis added); and (2) the determinative factor as to whether the deliberate indifference or purpose to harm standard applies is "whether the circumstances are such that *actual deliberation* [*by the officer*] is practical." *Porter*, 546 F.3d at 1137 (quoting *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 372 (9th Cir. 1998) (emphasis added)).

But, given the Ninth Circuit's clear indication that a municipality's omission can constitute deliberate indifference under other constitutional provisions, it follows that a municipality's omission may constitute deliberate indifference in violation of the Fourteenth Amendment's due process clause. At least one judge of this Court has so found. *See Estate of Prasad ex rel. Prasad v. Cnty. of Sutter*, 958

F. Supp. 2d 1103, 1119-20 (E.D. Cal. 2013) (finding that that "[a] prison official's deliberate indifference to a prisoner's serious medical needs shocks the conscience and states a claim under the substantive due process clause," and that the plaintiffs' "complaint amply alleges that the County's customs, practices, and policy of inaction caused [their relative's] preventable early death," which stated a claim of deliberate indifference that shocks the conscience). Thus, the Court is unaware of any binding precedent holding that a *Monell* claim premised on a municipality's deliberately indifferent inaction cannot, as a matter of law, form the basis of a Fourteenth Amendment due process claim.

The record is undeveloped with regard to the County's subject conduct. That is, the record is ambiguous or lacks sufficient information concerning (1) what, exactly, Caine told the County bailiffs during Decedent's trial; (2) whether and to what extent the bailiffs understood Caine's statements to them; (3) what, if anything, the bailiffs did in response to what Caine told them; and (4) whether and to what extent the bailiffs' conduct in response to Caine's statements was in line with official County policy. Given these uncertainties in the record, the Court is unable to determine whether the County's conduct "shocks the conscience." In other words, there exists a genuine issue of material fact concerning the issue. Defendants' motion for summary judgment on Plaintiffs' fourth cause of action therefore is DENIED.

**D.    Plaintiffs' Sixth Cause of Action.**

Plaintiffs' final claim is for wrongful death under CCP § 337.60 et seq. SAC at 14. Plaintiffs assert that Defendants "committed intentional or negligent misconduct that caused the untimely and wrongful death of [Decedent]." *Id.* at ¶ 51.

Defendants move for summary judgment on the claim for three reasons. *See* Doc. 60-1 at 32-34. First, Defendants argue that they are entitled to dismissal pursuant to the one action rule. *Id.* at 31. Second, Defendants assert that the County is not a proper defendant as a matter of law. *Id.* at 32. Third, Defendants maintain that Plaintiffs' wrongful death claim against Henderson fails because she was not negligent and, in any event, she is entitled to immunity under California Government Code § 820.2. *Id.*

**1.    One Action Rule.**

1    Defendants correctly point out that, under the binding one-action rule, "there can be only one

2    action for wrongful death in which all heirs are required to join; individual heirs cannot file a series of

3    wrongful death actions." *Id.* at 31 (citations omitted). Under CCP § 337.60, "[a]n heir who files a

4    wrongful death action is required to properly join all known heirs in the action." *Estate of Hatfield v.*

5    *Cnty. of Lake*, No. C 11-2396 PJH, 2012 WL 1949327, at *2 (N.D. Cal. May 29, 2012). Defendants

6    argue that Plaintiffs have violated the rule because "all known heirs are not properly named as plaintiffs"

7    because Plaintiffs failed to name Kaylianna. *See* Doc. 60-1 at 31-32.

8        Because Plaintiffs did not name Kaylianna in their original complaint, Defendants moved to

9    abate the action. *See* Doc. 38 at 1. The Magistrate Judge denied the motion and, instead, granted

10   Plaintiffs' request for leave to amend the complaint to name Kaylianna as an additional plaintiff. Doc.

11   46 at 2-4. Because Plaintiffs named Kaylianna as a Plaintiff in the SAC, there is no violation of the one

12   action rule. Defendants' motion for summary judgment on this ground therefore is DENIED.

13       **2.      The County.**

14       Defendants assert that the County is not a proper defendant for Plaintiffs' wrongful death claim

15   because "a direct tort cause of action against a public entity . . . cannot be maintained because there is no

16   existing statute providing for such liability." Doc. 60-1 at 32. Plaintiffs provide no response to this issue

17   in their opposition. *See generally* Doc. 67 at 21.

18       The Magistrate Judge already has resolved the issue. As the Magistrate Judge correctly pointed

19   out:

20       Except for certain statutory exceptions that do not apply in this case, a public entity is not liable
         for an injury to a prisoner. Ca. Gov. Code § 844.6(a)(2). "[S]ection 844.6 precludes actions
21       against public entities for the wrongful death of prisoners regardless of the underlying theory of
         liability." *May v. County of Monterey*, 139 Cal.App.3d 717, 721 (1983*). See also Lowman v.*
22       *County of Los Angeles*, 127 Cal.App.3d 613, 616 (1982) (holding that Section 844.6 granted
         public entities immunity from liability for prisoner's wrongful death). *Kings County is immune*
23       *from Madison Marie's claim* [*for wrongful death*].

24   Doc. 17 at 23 (emphasis added). Under the law of the case, the Court is bound by this determination and,

25   moreover, finds no reason to depart from it. *See supra* at 11. Accordingly, the Court GRANTS

26   Defendants' motion for summary judgment on Plaintiffs' wrongful death claim as to the County.

With regard to Defendants' argument that Henderson is entitled to immunity from Plaintiffs' wrongful death claim, again, the Magistrate Judge already has resolved the issue. In denying Defendants' motion to dismiss on that basis, the Magistrate Judge held that Henderson's decision to house Decedent and Parnell together "was a ministerial determination that is not entitled to immunity under [California Government Code] Section 820.2." *Id.* at 26. Under the law of the case, the Court is bound by this determination and, moreover, finds no reason to depart from it. *See supra* at 11. Accordingly, the Court DENIES Defendants' motion for summary judgment on Plaintiffs' wrongful death claim as to Henderson on the ground she is entitled to immunity from the claim.

"Except when otherwise provided by law, public employees in California are statutorily liable to the same extent as private persons for injuries caused by their acts or omissions, subject to the same defenses available to private persons." *Hayes v. Cnty. of San Diego*, 57 Cal.4th 622, 628-29 (2013) (citing Cal. Gov. Code § 820). "'The elements of the cause of action for wrongful death are the tort (negligence or other wrongful act), the resulting death, and the damages, consisting of the pecuniary loss suffered by the *heirs*.'" *Quiroz v. Seventh Ave. Center*, 140 Cal. App. 4th 1256, 1263 (2006) (emphasis in original). "[T]he existence of a duty is a question of law for the court." *Ky. Fried Chicken of Cal. v. Superior Court*, 14 Cal.4th 814, 819 (1997). "[I]n order to prove facts sufficient to support a finding of negligence, a plaintiff must show that [the] defendant had a duty to use due care, that he breached that duty, and that the breach was the proximate or legal cause of the resulting injury." *Quiroz*, 140 Cal. App. 4th at 629 (citations omitted). "If the court finds the defendant was under a duty to protect the plaintiff, the trier of fact must then decide whether the defendant's protective measures were reasonable under the circumstances—that is, whether there was a breach of the defendant's duty of care." *Nola M. v. Univ. of So. Cal.*, 16 Cal. App. 4th 421, 426 (1993).

Defendants assert that, based on the undisputed facts, Henderson was not negligent and did not breach any duty she owed to Decedent. *See* Doc. 60-1 at 32; Doc. 68-2 at 8. Specifically, Defendants assert:

Sgt. Henderson's owed a duty to [Decedent] to classify and house him in a manner that was compliant with Jail policy and practices, and to protect him from known actual substantial risks of harm to his safety by taking reasonable steps to alleviate the risk. As previously addressed, Sgt. Henderson fulfilled those obligations. Sgt. Henderson never become aware of any facts establishing risk to [Decedent's] safety from Parnell, let alone an actual substantial risk of harm. [Decedent] never requested protection from Parnell and is the reason he and Parnell came to be housed together.

Doc. 60-1 at 32. Plaintiffs offer no explanation of what they consider Henderson's duty toward Decedent to have been, but argue that "Henderson was not negligent," and that the undisputed facts "show that [their wrongful death claim] must be decided by a jury." Doc. 67 at 20.

Although Defendants cite no authority to support their iteration of the duty they claim Henderson owed Decedent, *see* Doc. 60-1 at 32, it appears largely in line with the standard applied in other inmate safety cases. As the Magistrate Judge previously noted, "a jailer owes a prisoner a duty of care to protect them from foreseeable harm." Doc. 17 at 22 (quoting *Giraldo v. Calif. Dep't of Corrections & Rehab*, 168 Cal. App. 4th 231, 252 (2008)). The court in *Giraldo* found that "recognition of such a duty finds support in numerous, if not all, pertinent authorities." *Id.* Relevant here, the court emphasized that foreseeability is "the most important consideration" in establishing a duty. *Id.* at 386.

As discussed above, there is no evidence that Henderson had any reason to believe that Parnell posed a risk to Decedent's safety. There was no indication of any adversity between Parnell and Decedent prior to Decedent's death. In other words, the undisputed facts demonstrate that Parnell did not pose a foreseeable risk of harm to Decedent of which Henderson was aware (or should have been aware). Accordingly, the undisputed facts demonstrate that Henderson did not breach her duty of care to protect Decedent from any foreseeable harm. The Court therefore GRANTS Defendants' motion for summary judgment on Plaintiffs' sixth cause of action for wrongful death as to Henderson.

## VI. CONCLUSION AND ORDER

For the foregoing reasons, the Court:

1.     DENIES Defendants' motion for summary judgment on the ground Plaintiffs lack standing;

2.     DISMISSES WITH PREJUDICE Plaintiffs' third and fifth causes of action;

3. GRANTS Defendants' motion for summary judgment on Plaintiffs' first cause of action in Henderson's favor and against Plaintiffs;

4. DENIES Defendants' motion for summary judgment on Plaintiffs' second cause of action based on the jail's housing policy, and GRANTS the motion in the County's favor and against Plaintiffs as to Plaintiffs' theory that the jail's staffing policy is unconstitutional;

5. GRANTS Defendants' motion for summary judgment on Plaintiffs' fourth cause of action in Henderson's favor and against Plaintiffs, and DENIES the motion as to the County;

6. GRANTS Defendants' motion for summary judgment on Plaintiffs' sixth cause of action in Defendants' favor and against Plaintiffs.

IT IS SO ORDERED.

Dated:   **January 7, 2015**                    **/s/ Lawrence J. O'Neill**
                                                UNITED STATES DISTRICT JUDGE